IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DANIELLE BLAHA, | ) | Case No. 1:16-cv-2306 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.    Introduction

Plaintiff, Danielle Eileen Blaha, seeks judicial review of the final decision of the Commissioner of Social Security denying her applications for Supplemental Security Income benefits and Disability Insurance Benefits[1] under Titles II and XVI of the Social Security Act ("Act").  This matter is before the court pursuant to 42 U.S.C. §405(g), 42 U.S.C. §1383(c)(3) and Local Rule 72.2(b).  Because I conclude that portions of the Commissioner's decision were not based on substantial evidence.  I recommend that the final decision of the Commissioner be VACATED and the case be REMANDED for further proceedings as described below.

## II.    Procedural History

Danielle Blaha protectively applied for supplemental security income and disability insurance benefits in January 2013.  (Tr. 15)  She initially alleged a disability onset date of

---

[1] During the administrative hearing, plaintiff amended her onset date and waived her DIB claim under Title II. (Tr. 42-43)

December 31, 2008, but amended it at the ALJ hearing to January 23, 2013. (Tr. 15, 42)  The

applications were denied initially in May 2013 (Tr. 155, 162) and after reconsideration on

August 6, 2013. (Tr. 114, 131)  On October 4, 2013, Blaha requested an administrative hearing.

(Tr.183)  A hearing was held before Administrative Law Judge ("ALJ"), Penny Loucas, on May

6, 2015. (Tr. 37-86)  The ALJ found that Blaha was not disabled in a July 17, 2015 decision. (Tr.

15-30)  Blaha requested review of the hearing decision on August 24, 2015. (Tr. 7)  On July 19,

2016, the Appeals Council denied review, rendering the ALJ's conclusion the final decision of

the Commissioner. (Tr. 1-6)  On September 16, 2016 Blaha instituted this action to challenge the

Commissioner's final decision.

## III.     Evidence

### A.     Personal, Educational and Vocational Evidence

Danielle Eileen Blaha was born on August 4, 1982 and was 30 years old on the date of the

alleged onset of her disability.  (Tr. 28)  She has a law degree and a graduate degree. (Tr. 138-139)

She has previous work experience as a receptionist, a courier for a law firm, working at a restaurant

and at the front desk of a hotel.  (Tr. 53-57)

### B.     Medical Evidence

Although plaintiff amended her disability onset date to January 23, 2103, the

administrative record contains extensive medical records dating back to 2009.  Because

plaintiff's arguments focus upon her chronic pain conditions and the associated impact they had

on her mental health (as well as other mental health triggers), it is necessary to summarize the

details of her condition for the entire period.  The timing of treatments and findings concerning

plaintiff's condition is critical because plaintiff accuses the ALJ and the Commissioner of

conflating findings from the pre-onset-date period with later findings in order to justify their conclusions.

### 1. Evidence Regarding Plaintiff's Physical Limitations

Plaintiff was diagnosed with neurofibromatosis in 2003. (Tr. 329) The disease is characterized by innumerable tumors on her nerve tissues and can cause severe pain. (Tr. 678) Plaintiff has also been diagnosed with chronic pain syndrome and has sought various pain reduction treatments over the years. (Tr. 708) Plaintiff also has pain and other issues related to her female organs including ovarian cyst complex. (Tr. 708)

On November 13, 2009, plaintiff met with Glen Stevens, D.O., Ph.D., at the Cleveland Clinic for a neurological evaluation and consultation regarding her neurofibromatosis. (Tr. 329-333) In reviewing plaintiff's medical history, Dr. Stevens noted that plaintiff underwent a resection of a right sciatic neurofibroma in July 2005 and surgery on the left thigh neurofibroma in December 2007. (Tr. 329) After the surgery, she developed new left foot pain that was chronic and persistent. (Tr.329) She received nerve blocks and steroid injections that helped for a while. (Tr. 329) In November 2009, when she met with Dr. Stevens for further care related to her neurofibromatosis, plaintiff was using an epidural catheter and oral medications to control the pain. (Tr. 329)

On examination, Dr. Stevens noted that plaintiff had a slow, mildly antalgic gait, full muscle strength in her extremities, good memory, good attention and concentration, intact sensation, fast and smooth rapid alternating movement in her limbs, and intact finger-to-nose coordination. (Tr. 331-332) Dr. Stevens reviewed an MRI of her left lower extremity that revealed neurofibromas in the calf, but without definite evidence of malignant degeneration. An MRI of plaintiff's thoracic and lumber spine also revealed spinal nerve sheath tumors mildly

increased in size and number since the prior exam (January 2006), but with stable appearance of the lumbosacral plexiform neurofibromas. (Tr. 332-333)

In January, February and March of 2010, plaintiff received a series of nerve blocks in her lower leg. (Tr. 623, 628, 633)  She received a diagnosis of CRPS (Complex Regional Pain Syndrome, Type II).  (Tr. 624)  On April 12, 2010, plaintiff reported that she had relief from her symptoms after the last nerve block but that her symptoms had now returned to baseline. (Tr. 611)  Plaintiff followed-up with Dr. Stevens in May 2010.  Dr. Stevens told her about a clinical trial option for treatment of her neurofibromatosis. (Tr. 609)  However, this option was not practical for plaintiff because she was required to have frequent MRI scans. (Tr. 609)

In June 2010, plaintiff received a series of three Ketamine infusions to reduce her left lower extremity pain. (Tr. 592-599)  In July 2010, plaintiff attended two appointments for acupuncture treatments. (Tr. 585-587)

Plaintiff was examined by Anne Sapeinza-Crawford, CNP, a nurse practitioner at the Cleveland Clinic Pain Management Center on August 3, 3010 and September 1, 2010. (Tr. 580-581, 583)  Ms. Sapienza-Crawford noted that plaintiff's extremities appeared normal with slight swelling of her left lower extremity; she had intact motor strength and sensation; but was limping due to pain. (Tr. 580-581)  Plaintiff received another series of Ketamine infusions in September 2010. (Tr. 567-577)   Plaintiff returned to Dr. Stevens on September 30, 2010 for a follow-up appointment. (Tr. 560-565)

On October 20, 2010, Nurse Sapienza-Crawford examined plaintiff and noted that her extremities appeared normal with slight swelling of her left lower extremity; she had intact motor strength and sensation, but she had a limp due to pain. (Tr. 558)  On November 10, 2010,

Gregory Evans, M.D. a physician at the Cleveland Clinic Pain Management Center noted normal extremities with no swelling and that plaintiff had a limp due to pain. (Tr. 555)

On December 7, 2010, plaintiff met with another physician at the Cleveland Clinic Pain Management Center, Dmitri Souzdalnitski, M.D. (Tr. 550) Dr. Souzdalnitski noted that plaintiff exhibited a normal gait, full and pain free extremity range of motion, and normal extremity strength. (Tr. 550)

In January 2011, plaintiff met with Judith Scheman, Ph.D. for a pain medication evaluation. (Tr. 539, 541) Plaintiff was attending Cleveland State University full-time, pursuing a master's degree in environmental studies. She told Dr. Scheman that she was planning to work as an environmental lawyer. However, for now, she was working as a tutor. (Tr. 541) She reported having a boyfriend who lived in Costa Rica. (Tr. 541) Plaintiff complained of pain in her left foot that traveled up her left leg to her mid-calf; pain in both thighs and pelvic pain. (Tr. 539) Dr. Scheman noted that plaintiff was pleasant and cooperative, with no evidence of cognitive dysfunction. (Tr. 541) Dr. Scheman noted diagnoses of chronic pain disorder; pain in limb; complex regional pain syndrome type II; and neurofibromatosis, type 1. (Tr. 541)

On February 1, 2011, plaintiff returned to the Cleveland Clinic Pain Management Center. (Tr. 535) She reported that a nerve block on January 4, 2011 had given her good results for two or three weeks, but that her pain was now worsening. (Tr. 534, 535) Physical examination revealed that peripheral joint range of motion was full and pain free without obvious instability or laxity in all four extremities. The physician also observed normal gait during this examination. (Tr. 535)

On February 22, 2011, plaintiff met with Joseph Abdelmalak, M.D., at the Cleveland Clinic Pain Management Center. (Tr. 529) Plaintiff reported that her pain had been improving

and was currently a 6 on a 0/10 scale. (Tr. 529)  An MRI showed multiple neurofibromas that were grossly stable with no cord compression or lesions within the central canal. (Tr. 530)  Physical examination revealed similar findings to those noted at her appointment on February 1, 2011. (Tr. 530)

On May 4, 2011, plaintiff met with Alexander Feoktistov, MD, Ph.D., at the Cleveland Clinic Pain Management Center.  (Tr. 525-526)  Plaintiff reported that her pain had been improving.  She also reported that she had been off of her medications for two and a half weeks because they had been shipped to Costa Rica and were lost in the mail.  She experienced some withdrawal symptoms as a result. (Tr. 526)  Examination notes showed that plaintiff's mood and affect were appropriate; she had normal and symmetric strength in her arms and legs; she had normal range of motion in her back; mild swelling her left foot/ankle; a normal gait; and decreased sensation in the lateral part of her right foot.  (Tr. 526)  Examination findings by Dr. Feokstitov on June 22, 2011 were similar. (Tr. 522)

Plaintiff returned to Dr. Stevens on July 1, 2011.  Dr. Stevens noted good memory, good attention and concentration, intact sensation, smooth and fast rapid alternating movements in her limbs and intact finger-to-nose coordination. (Tr. 516-517)  He noted slow and mildly antalgic gait. (Tr. 516)

Plaintiff returned to the Cleveland Clinic Pain Management Center on August 24, 2011 and met with Shrif Constandi, M.D.  (Tr. 510-515)  Physical examination revealed that plaintiff had normal range of motion in her back and normal joint range of motion in her arms and legs without obvious instability or laxity.  Bilateral upper and lower extremity strength was normal and symmetric.  However, she had decreased motor strength of the left foot with decreased sensation on the lateral aspect of the left foot and decreased ankle reflex on the left side.  Toe

walking, heal walking and tandem gait were normal. (Tr. 511)  Similar findings were recorded at subsequent visits on October 12, 2011 and October 26, 2011.  (Tr. 507, 503)

Plaintiff returned to the Cleveland Clinic Pain Management Center on December 5, 2011. (Tr. 499)  Notes from this visit stated that plaintiff had returned early for medication refills because her medications had been in her car when it was stolen.  (Tr. 499)  "She was held at gun point when getting out of her car in Cincinnati.  She has a police report to document the incident. Her medications were in her car as she was visiting a friend." (Tr. 499)

On February 1, 2012, plaintiff had an appointment with Sarah Raymond, CNP, a nurse practitioner at the Cleveland Clinic Pain Management Center.  (Tr. 495)  Plaintiff reported that she had flushed her pain medications down the toilet because she did not want to take pain medication anymore or deal with its side effects. (Tr. 496)  However, at her appointment with Ms. Raymond, plaintiff requested pain medication at a lower dose for breakthrough pain. (Tr. 496)  Nurse Raymond's notes reflected that plaintiff had normal range of motion in her back; her left lower extremity appeared normal with no swelling; and her gait was steady.  (Tr. 496)

Plaintiff had several appointments at the Cleveland Clinic Pain Management Center in April and May 2012.  Plaintiff was experiencing increasing numbness in her left lower extremity, but otherwise her condition was stable.  (Tr. 472, 479, 485)

On July 24, 2012, plaintiff met with Adam Kramer, M.D., at the Cleveland Clinic Pain Management Center.  (Tr. 464)  Plaintiff reported that she had been doing well about three to four weeks ago but that her pain was now worsening. (Tr. 464)  Plaintiff reported that she was participating in martial arts classes four times per week.  Dr. Kramer noted that plaintiff was very active and had excellent coping skills and a great support network which allowed her to function "at such a high level with her condition."  (Tr. 466)  Plaintiff had full and pain free range of

motion in her arms and legs, diminished sensation in her left lower extremity, normal motor strength in her extremities, and an antalgic gait. (Tr. 465)

On August 3, 2012, plaintiff met with Dr. John Bertsch and reported pain in her fifth finger on right hand after it was hit at judo practice. She reported a history of prior injuries which eventually resolved on their own. (Tr. 839)

Plaintiff returned to Dr. Stevens on August 20, 2012. (Tr. 458-460) Plaintiff complained of losing more function in her left foot. Otherwise, Dr. Stevens' physical examination didn't reveal any significant physical changes. (Tr. 460) Plaintiff was considering having more Ketamine infusions. (Tr. 458-459)

On September 18, 2012, plaintiff met with Dr. Kramer at the Cleveland Clinic Pain Management Center. (Tr. 450-453) Dr. Kramer noted that plaintiff had recently had a setback due to sinusitis and a foot staph infection. (Tr. 453) Plaintiff had normal range of motion in her back and extremities; she had a loss of sensation in her left lateral lower leg and foot and a mild antalgic gait. (Tr. 453)

On October 8, 2012, plaintiff reported to Dr. Bertsch that she had been head butted at practice a week ago and had lost consciousness. Since then, she was experiencing problems with scrambling her thoughts, difficulty finding words and increased pain. (Tr. 822) A CT scan of her brain was unremarkable. (Tr. 828)

On October 24, 2012, plaintiff met with Nurse Raymond and reported that, since she suffered a concussion, she was having difficulty reading, impulse control, problem solving, thinking clearly, and overall anxiety issues. (Tr. 447) Plaintiff requested that her medications be changed to Tylenol with codeine, rather than Vicodin, which was heightening problems she was experiencing after the concussion. (Tr. 447)

In November 2012, plaintiff returned to the Cleveland Clinic Pain Management Center and continued to complain of head pain. She reported that her head pain was worse than her chronic leg pain. (Tr. 434) Physical examination showed normal range of motion but loss of sensation in her left lower leg and foot and an antalgic gait. (Tr. 437) Plaintiff reported that she was playing tennis for exercise. (Tr. 443)

On December 12, 2012, plaintiff met with Dr. Bertsch. (Tr. 812) She complained that since her concussion she was having marked headaches, cracking sounds in her neck, increased sinus congestion and drainage, some associated dizziness and was not getting any relief from her current medications. (Tr. 812) Dr. Bertsch observed decreased range of motion and tenderness in her cervical back. A CT scan returned normal results and x-rays of the cervical spine revealed mild reversal of the normal cervical lordosis, without other abnormalities. (Tr. 811)

Plaintiff followed-up with Nurse Raymond on December 21, 2012. (Tr. 431) Her medications had been switched to Percocet and Voltaren gel and she reported a positive response. (Tr. 431)

In January 2013, plaintiff underwent five consecutive daily Ketamine infusions. (Tr. 408-427) On January 14, 2013, an MRI of plaintiff's pelvic region revealed innumerable neurofibromas along the lumbosacral plexus and sciatic nerves which were unchanged in appearance. (Tr. 722)

Again, Blaha alleges an onset date of January 23, 2013. The following records describe findings during the post-onset period.

Plaintiff went to the emergency room on January 27, 2013. She reported worsening left leg pain, weakness and numbness. She was unable to bear weight or ambulate on the leg. (Tr. 343-354) Alicia Glynn, M.D., noted that plaintiff had mild proximal weakness in the left lower

extremity, but otherwise there were no objective neurological deficits. An MRI showed extensive neurofibromas involving all nerve roots in the neural foramina of the lower lumbar spine and sacral spine, but no significant changes since the September 2011 study. (Tr. 352)

On January 30, 2013, plaintiff met with Dr. Bertsch complaining of severe pain in her left leg which began after yoga. (Tr. 661) Dr. Bertsch noted decreased range of motion and tenderness in her lumbar spine, but normal motor strength and sensation and a normal gait. (Tr. 663)

Plaintiff met with Nurse Raymond on February 1, 2013 complaining of worsening leg pain. (Tr. 363) Plaintiff was extremely anxious and tearful. (Tr. 365) Plaintiff had normal range of motion in her back and a steady gait. (Tr. 364-365) She followed up with Nurse Raymond on February 27, 2013. (Tr. 368) Plaintiff's pain had improved since last month. (Tr. 368) She was still having sinus headaches but her mood was improved. (Tr. 368) Plaintiff's gait was steady without assistive devices. (Tr. 369) On March 19, 2013, plaintiff reported that she had been going to the YMCA and swimming once per week. (Tr. 706)

Plaintiff met with Dr. Stevens on March 29, 2013 complaining of increased pain in her left leg. (Tr. 698-702) Dr. Stevens noted that plaintiff was in some distress and was constantly shifting positions for comfort and was getting up and walking about. (Tr. 699) He saw little change in the appearance of the neurofibromas but noticed more fatty atrophy of the muscle groups in plaintiff's left calf. (Tr. 700) He felt that even though there had been a small degree of change with the neurofibromas during the past 10 years, the minor change could be enough to further irritate plaintiff's nerves. (Tr. 702)

On May 1, 2013, plaintiff met with Dr. Bertsch complaining of intermittent neck pain which had been occurring for months. (Tr. 793) She had decreased range of motion in her

cervical area with marked spasm of the left paracervical neck muscles.  (Tr. 795)  Plaintiff

received a trigger point injection on May 16, 2013 to reduce neck pain. (Tr. 672)

Plaintiff met with Judith Scheman, Ph.D., on May 15, 2013 for a pain medication

evaluation.  (Tr. 677-678)  Dr. Scheman noted that plaintiff had been working as a tutor and she

would like to work as a grant writer.  Dr. Scheman stated that plaintiff was alert, pleasant and

cooperative; plaintiff's affect was anxious; but there was no evidence of psychosis or cognitive

dysfunction. (Tr. 682)

Plaintiff met with Steven J. Shook, M.D., for a neuromuscular consultation on June 20,

2013. (Tr. 952)  Plaintiff had normal range of motion in her neck; strength was reduced at the left

flexors – otherwise her strength was 5/5 throughout; she had decreased pinprick sensation on her

left lateral and plantar foot; her gait was antalgic, but narrow based and stable. (Tr. 955)  An

EMG study taken on June 24, 2013 revealed evidence of left tibial mononeuropathy affecting

sensory and motor function in the left lower leg. (Tr. 951)

Plaintiff met with Kambiz Kamian, M.D. on July 3, 2013.  Dr. Kamian recommended

that plaintiff undergo surgery to remove a few large neurofibromas on her left sciatic nerve. (Tr.

942)  Dr. Kamian performed the surgery on July 16, 2013.  (Tr. 917-918)  Plaintiff was

discharged from the hospital on July 18, 2013. (Tr. 917)

Plaintiff followed-up with Dr. Bertsch after her surgery on July 29, 2013.  (Tr. 777)

Plaintiff complained of swelling in her left leg, no changes in continual chronic pain, but better

strength in her foot since the surgery. (777)   Plaintiff met with Dr. Kamian on August 15, 2013

and reported that a small part of her incision was opening up. (Tr. 896)  His notes stated that her

pain had improved post-surgery. (Tr. 896)

On September 24, 2013, plaintiff met with Nurse Raymond and reported that she has seen great improvement in her left leg pain and numbness but that her neck pain had returned. She wanted to discuss having repeat cervical epidural injections. (Tr. 879) Nurse Raymond noted mild tenderness along plaintiff's thoracic spine, but normal strength and gait. (Tr. 882)

Plaintiff was scheduled to receive a cervical epidural steroid injection on October 24, 2013 but it was rescheduled because she had an upper respiratory infection and was on her second round of antibiotics. (Tr. 876) On November 4, 2013, Dr. Bertsch noted that plaintiff had decreased range of motion, tenderness, deformity, spasm and decreased strength in her right shoulder. She also had decreased range of motion, tenderness, and deformity in her cervical back. (Tr. 1002) On November 11, 2013, plaintiff received a cervical steroid injection for her neck pain. (Tr. 871)

On November 14, 2013, plaintiff had a follow up appointment with Dr. Kamian after her surgery. Dr. Kamian noted that plaintiff's pain had improved and her incision had healed well. (Tr. 858-859)

Plaintiff attended physical therapy from January 6, 2014 to February 10, 2014. (Tr. 972, 974-981) A medical note from January 15, 2014 states that plaintiff was not having a good week. She had just come from the Y pool – swimming and walking, hot tub and sauna. She was sore from her last session. (Tr. 976)

On January 21, 2014, plaintiff reported to Dr. Bertsch that she was having numerous falls and issues with balance and leg strength. She had injured her left shoulder and was having pain. (Tr. 996) Dr. Bertsch noted that plaintiff had decreased range of motion, tenderness, spasm and decreased strength in her left shoulder. (Tr. 996) An MRI taken on January 30, 2014 showed

minimal rotator cuff tendinosis and chronic degenerative changes/fraying of the superior labrum. (Tr. 995)

In March 2014, plaintiff attended three sessions of physical therapy for her neck and shoulder. (Tr. 1006-1015)

On September 22, 2014, plaintiff met with Dr. Anthony Rizzo, M.D., at the Cleveland Clinic Department of Vascular Surgery with complaints of left leg pain. (Tr. 1025) Dr. Rizzo noted that plaintiff had swelling of her left leg and thought that her pain was most likely associated with compression from a neurofibroma. (Tr. 1028) He recommended that she use compression stockings and to follow-up if symptoms worsened. (Tr. 1028)

On November 12, 2014, plaintiff had an appointment with Dr. Bertsch and complained of pain and swelling in her left foot after dancing four days ago. Dr. Bertsch noted that her left foot was bruised, blistered and very tender. (Tr. 1111)

Plaintiff had a follow up appointment on March 27, 2015 at the Cleveland Clinic Pain Management Center. (Tr. 1076) Plaintiff reported a 40% pain relief following her surgery on her left leg. (Tr. 1080) She complained of pain in both shoulders and in her groin. She rated the pain as a 6 out of 10. Plaintiff also reported hair loss from one of her medications, which were adjusted at the appointment. (Tr. 1080) On April 24, 2015, plaintiff received trigger point injections at her bilateral cervical and trapezius muscles. (Tr. 1073)

### 2.      Evidence Regarding Plaintiff's Mental Condition

Plaintiff has received intermittent counseling throughout her lifetime. (Tr. 682) She began having mental issues as early as six years old when she was diagnosed with attention deficit disorder. (Tr. 63) When she was in high school, she was treated for bulimia and anorexia. (Tr. 682)

Plaintiff began treating with Erika Nathan, M.D. on June 20, 2012 for complaints of ADD and PTSD. (Tr. 395) Plaintiff complained of nightmares, being jumpy, getting frustrated and having many ADD symptoms. (Tr. 395) She denied flashbacks or panic attacks and stated that her mood was positive. (Tr. 395) Dr. Nathan noted that plaintiff had been carjacked twice – once in 2006 and again in 2011. (Tr. 395) Dr. Nathan diagnosed attention/focus issues and anxiety. (Tr. 396) She prescribed Adderall. (Tr. 397)

On June 22, 2012, plaintiff reported a rash on her body since she started taking Adderall. (Tr. 394) On July 6, 2012, plaintiff reported that the increased dose of Adderall was too high and she felt "zoned out" and a little more irritable. (Tr. 393) Dr. Nathan noted that plaintiff had no abnormalities in functioning and a stable mood. (Tr. 393) She decreased plaintiff's dosage of Adderall. (Tr. 393)

On August 3, 2012, Dr. Nathan noted sleep paralysis when plaintiff was going to sleep but her nightmares had lessened. Plaintiff's sleep was poor; her energy level and concentration levels were fair and her mood was stable. (Tr. 392) In September 2012, Dr. Nathan continued to note that plaintiff had "fair" energy levels and concentration with mild anxiety. (Tr. 389)

On October 12, 2012, Dr. Nathan noted that plaintiff had incurred a moderate concussion after she was head butted by a girl in Jiu Jitsu class. (Tr. 388) She again noted poor sleep, energy levels, and concentration. Plaintiff was anxious and didn't know the month or the day. Dr. Nathan adjusted plaintiff's medications. (Tr. 388)

On October 19, 2012, plaintiff reported feeling jumpy, startling easier, being afraid to go out at night, hypersensitive to sounds at night and was expecting something bad to happen. She was still not able to read books after her head injury but had started watching TV shows about three days ago. (Tr. 387) On November 1, 2012, Dr. Nathan noted less anxiety and that plaintiff

was driving now. She was still having a lot of pain and headaches. (Tr. 386) She also noted that Ritalin was helping with pain, nervousness and concentration. (Tr. 386)

On December 7, 2012, plaintiff reported being very sleepy and fighting fatigue when Concerta was wearing off. (Tr. 382) Dr. Nathan noted that plaintiff's categories of functioning (sleep, energy, etc.) were all fair. (Tr. 382) In January 2013, plaintiff continued to report that her Concerta medication was wearing off quickly. She was taking it around 9 a.m. and was tired in the afternoon. (Tr. 381) Dr. Nathan also noted that plaintiff's anxiety was "pretty good under control." (Tr. 381)

Again, Blaha alleges an onset date of January 23, 2013. The following records describe findings during the post-onset period.

On January 25, 2013, plaintiff was having nightmares and was sleeping fourteen hours per day. Her mood was up and down and she had little energy. Dr. Nathan noted that all of plaintiff's areas of functioning were poor. Plaintiff was isolating to home. However, plaintiff had gotten a YMCA membership and joined a yoga class. (Tr. 380)

On February 13, 2013, Dr. Nathan noted that plaintiff was having more physical pain. She had experienced some negative side effects (psychosis) from taking Zoloft and had stopped taking it. Plaintiff's progress had declined and her living skills functioning was noted as poor. (Tr. 379) Dr. Nathan also noted further decline and personal problems on March 6, 2013. Plaintiff was 30 minutes late to her appointment. She reported her mother was being emotionally abusive. She was not participating in any exercise classes because she had no energy. Plaintiff was tearful and shaky throughout the appointment. (Tr. 734)

Plaintiff was slightly improved on March 20, 2013 and Dr. Nathan attributed the improvement to plaintiff's Neurontin prescription. (Tr. 733) However, on April 24, 2013,

plaintiff reported that she was laying on the couch all day and was unable to focus. She had stopped taking some of her pain medications because they were causing her to feel more depressed or were causing swelling. Dr. Nathan noted that she had completed paperwork for a disability determination at this appointment. (Tr. 732)

On May 29, 2013, Dr. Nathan noted some improvement and indicated that plaintiff's memory was "OK when fighting with mom." Plaintiff's mood was "so-so." Plaintiff's anxiety seemed to improve when she had an injection in her neck that resolved pain. (Tr. 729)

On January 15, 2014, plaintiff reported that she had fallen when she tried to work out. She had bruises on her shins. She also reported hitting her head on the refrigerator door yesterday when she was getting something out. She felt she was having spatial issues. Her appearance was disheveled, but otherwise, her mental status examination was normal. (Tr. 1059) Plaintiff's mental status examination was also noted as normal on March 12, 2014 even though the appointment began with plaintiff in a "state of panic, visibly having difficulty breathing, focusing, tremulous, she described that she was almost in a car accident which put her into a past trauma." (Tr. 1057)

On April 28, 2014, Dr. Nathan noted that plaintiff had an unsteady gait, but her mental status examination showed mostly normal results. Dr. Nathan felt that plaintiff was focusing better with a higher dose of Concerta. (Tr. 1055) Her mental status examination showed normal results on June 19, 2014. Dr. Nathan noted that plaintiff had been sick and her PTSD symptoms worsened when she was sick. (Tr. 1052)

On August 5, 2014, plaintiff was admitted to the hospital. She was depressed, frustrated and confused. She was hearing voices and speaking nonsensically. (Tr. 1182) She hadn't slept or eaten in four days. (Tr. 1184) By August 7, 2014, hospital notes stated that plaintiff was

normally oriented to time place and person and her recent and remote memory were intact. (Tr. 1215) She was in the hospital for six days and was discharged on August 11, 2014. Plaintiff was not at imminent risk for suicide. Her delusions and psychotic appearance at admission were believed to be the result of benzodiazepine withdrawal. (Tr. 1219) Following discharge, plaintiff underwent an assessment at Ravenwood Mental Health Center and was referred to a partial hospitalization program. (Tr. 1281-1290)

On October 2, 2014, plaintiff reported to Dr. Nathan that she was not doing very well. She was overly sedated on Haldol and was having increased anxiety. (Tr. 1047) Nonetheless, her mental status was noted as normal. Plaintiff denied any hallucinations or delusions. (Tr. 1047) On October 30, 2014, plaintiff reported doing better but getting very depressed for about two hours every afternoon. She was more stable but had a severe episode of crying on the date of the appointment and was experiencing a lot of anxiety. (Tr. 1045)

On December 11, 2014, plaintiff continued to display a nervous mood, normal reasoning, intact memory, normal thought process, but she felt unsafe and had increased anxiety in crowds. (Tr. 1043) On January 29, 2015, Dr. Nathan noted that plaintiff was doing about the same. (Tr. 1042)

Plaintiff also attended group therapy with Karen Hull, LISW, between June 12, 2014 and April 14, 2015. (Tr. 1063–1072) On December 18, 2014, Ms. Hull completed a questionnaire regarding plaintiff's ability to work. (Tr. 1022-1024) Ms. Hull opined that plaintiff's functional abilities very limited and that she would be unable to manage her own benefits. (Tr. 1022-1024)

### C.     Opinion Evidence

#### 1.     Treating Physician, John Bertsch – October 2013

Dr. Bertsch, who had extensive history of treating Blaha, completed a Residual Functional Capacity Questionnaire on October 14, 2013.  (Tr. 756-760)  Dr. Bertsch opined that plaintiff could walk half a block before needing to rest; that she would require low stress jobs; that she could sit for 30 minutes at a time; stand for 15 minutes at a time; would be able to stand/walk for about 2 hours total during a workday and sit for at least 6 hours during the workday. (Tr. 758)  He further opined that plaintiff would need to be permitted to shift from sitting, standing, or walking at will; that she would need to take unscheduled breaks two to three times per week; and that she would need to rest for a ½ hour before returning to work. (Tr. 759) Dr. Bertsch indicated that plaintiff was taking medications that would impair her cognitive abilities and would likely result in frequent mistakes. (Tr. 760)  He opined that plaintiff was likely to have good and bad days and that she was likely to miss more than four days of work per month.  (Tr. 760)

#### 2.     Treating Psychiatrist, Erika Nathan, M.D. – April 2013

Dr. Erika Nathan, who had provided extensive psychiatric care to Blaha, completed a Mental Status Questionnaire on April 26, 2013.  (Tr. 637-639)  Dr. Nathan described plaintiff's appearance as casually dressed, hair unkempt.  Her flow of conversation was not particularly spontaneous; her mood was "OK;" affect was irritable and dysphonic.  Dr. Nathan indicated that plaintiff showed anxiety when she started shifting more in her seat and got irritated when discussing chronic pain.  She noted that plaintiff was very focused on her symptoms.  Plaintiff complained of poor concentration and became easily frustrated.  Her insight and judgment were both poor. (Tr. 637)  In listing treatment and medications, Dr. Nathan stated that Concerta was

prescribed for attention but plaintiff had minimal response due to her severe level of pain. She also stated that plaintiff had initially been diagnosed with PTSD but that it had appeared to resolve with time "unsure". (Tr. 638) As to plaintiff's ability to remember, understand and follow directions, Dr. Nathan wrote, "she has had difficulty with this over past few months when suffering post-concussive syndrome but improved past two months with physical – headaches lessened but she is still very labile with poor mood and still exploring if this is chronic due to cluster B traits or a result of concussion." Dr. Nathan opined that plaintiff's ability to sustain concentration, persist at tasks, and complete them in a timely fashion was poor. She felt that plaintiff's social interactions were very poor – "she appears to have no friends, has a boyfriend and parents with poor interactions with them at times." Her adaptation and ability to react to pressures in the workplace or elsewhere were also stated as "poor." (Tr. 638)

Dr. Nathan also competed a check-box form entitled "Mental Functional Capacity Assessment." (Tr. 968) On this form, Dr. Nathan opined that plaintiff was not significantly limited in her ability to remember locations and work-like procedures; and in her ability to understand, remember, and carry out very short and simple instructions. She felt that plaintiff was moderately limited in her ability to understand, remember and carry out detailed instructions; in her ability to sustain an ordinary routine without special supervision; in her ability to make simple work related decisions; in her ability to ask simple questions or request assistance; in her ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; in her ability to be aware of normal hazards and take appropriate precautions; and in her ability to set realistic goals or make plans independently of others. Finally, Dr. Nathan opined that plaintiff was markedly limited in her ability to maintain attention and concentration for extended periods; in her ability to perform activities with a schedule,

maintain regular attendance and be punctual with customary tolerances; in her ability to work in coordination with or proximity to others without being distracted by them; in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; in her ability to interact appropriately with the general public; in her ability to accept instructions and respond appropriately to criticism from supervisors; in her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; in her ability to respond appropriately to changes in the work setting; and in her ability to travel to unfamiliar places or use public transportation. (Tr. 968) Dr. Nathan opined that plaintiff was unemployable and that her physical and mental functional limitations were expected to last 12 months or more. (Tr. 968)

Following the administrative hearing, plaintiff's attorney sent a letter to Dr. Nathan reporting that the ALJ had observed that Dr. Nathan's office notes stated that plaintiff had normal appearance, speech, spontaneity, reason, impulsivity, thought process and thought content and that her long term memory and insight were intact. Plaintiff's attorney asked that Dr. Nathan reconcile these normal and intact findings with the limitations she had identified in the forms. On May 18, 2015, Dr. Nathan responded that, "[t]here is a limitation to the electronic health record that absolutely in Danielle's case does not reflect her deficits. Please note that the forms are much more specific and reflect Danielle and how her mental and physical illnesses affect her ability to function."

### 3. Treating Therapist - Karen Hull, LISW – December 2014

Karen Hull, LISW, completed a form on December 18, 2014 regarding plaintiff's abilities to work. (Tr. 1022-1024) Ms. Hull noted that psychiatric illnesses affected every aspect

of plaintiff's life.  (Tr. 1023)  Ms. Hull opined that plaintiff's ability to ask simple questions or request assistance; her ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; her ability to be aware of normal hazards and take appropriate precautions; her ability to set realistic goals or make plans independently from others; her ability to maintain socially appropriate behavior; her ability to adhere to basic standards of neatness and cleanliness; and her ability to use public transportation were all good.  She felt that plaintiff was fair in her ability to remember work-like procedures; carry out very short and simple instructions; work in coordination with or proximity to others without being unduly distracted; make simple decision; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in a routine work setting; deal with stress of semiskilled and skilled work; interact appropriately with the general public; and travel in an unfamiliar place.  However, Ms. Hull opined that plaintiff had poor to no ability to understand and remember very short and simple instructions; maintain attention for a two hour segment; maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; deal with normal work stress; understand and remember detailed instructions; and carry out detailed instructions.  (Tr. 1022-1024)

### 4.      State Agency Reviewing Physicians

Dr. Esberdado Villanueva, M.D., reviewed plaintiff's file on May 7, 2013.   Dr. Villanueva opined that plaintiff could perform light work with occasional foot controls with the left lower extremity. (Tr. 94)  He further limited her to occasional climbing ramps and stairs,

occasional stooping and crawling; frequent balancing, kneeling and crouching; and no climbing of ladders, ropes or scaffolds, and she was required to avoid concentrated exposure to hazards such as machinery or heights. (Tr. 95)

On July 29, 2013, Gerald Klyop, M.D., reviewed plaintiff's medical records and agreed with Dr. Villanueva's opinion. (Tr. 123-125)

### 5.     State Agency Reviewing Psychologists

On May 1, 2013, state agency psychologist, Cynthia Waggoner, Psy.D., reviewed plaintiff's file and opined that plaintiff could do simple, routine tasks so long as she was not required to meet strict production demands or work at a fast pace. (Tr. 96-97) She also noted that plaintiff had a tendency to become irritable with others; she had limited social contacts; and experienced flashbacks to times when she was assaulted and carjacked. Dr. Waggoner opined that plaintiff was limited to occasional, superficial interactions with others, including the public, co-workers and supervisors.

On August 2, 2013, state agency psychologist, Roseanne Umana, Ph.D., affirmed the opinion of Dr. Waggoner. (Tr. 125-127)

### 6.     Psychologist Steven Kanter – February 2014

On February 17, 2014, Dr. Steven Kanter performed a psychological consultative exam of plaintiff on behalf of Job & Family Services. (Tr. 40, 960-964) Plaintiff presented with a very depressed and anxious mood. Dr. Kanter noted that plaintiff's speech was often pressured and that she tended to ramble on and go off on tangents. He was not sure whether her statements were reality based or were exaggerated because of distorted thinking. Some of her thoughts were paranoid and/or illogical. She was not having any hallucinations and her intelligence was above average. She had fair insight. (Tr. 963) Dr. Kanter diagnosed PTSD and depressive disorder and

assigned a GAF score of 48. (Tr. 964)  Dr. Kanter opined that plaintiff was markedly limited in her ability to understand and remember detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriate with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to travel to unfamiliar places or use public transportation.  Dr. Kanter opined that plaintiff was unemployable and that her disability was expected to last 12 months or more. (Tr. 967)

### D.    Testimonial Evidence[2]

#### 1.    Testimony of Danielle Eileen Blaha

Blaha testified as follows at her hearing:

- Plaintiff was 32 years old on the date of the hearing. (Tr. 52)

- She graduated from high school in 2000.  She went to the University of Dayton and graduated in 2004.  She then took a year off and went to law school at the University of Cincinnati. She graduated from law school in 2008.  (Tr. 52-53)

- Plaintiff had previous work experience as a waitress, a courier for a law firm, a receptionist, and a hotel clerk.

- She felt that she was no longer able to do her past work because of limitations caused by her conditions of bipolar and depression. (Tr. 59)

- At the time of the hearing, plaintiff was attending group therapy sessions on Monday, Thursday and Friday from 9:30 a.m. to 1:30 p.m.  (Tr. 60)

---

[2] Bruce Holderhead, a vocational expert ("VE"), also testified at plaintiff's hearing. (Tr. 79-85)  Because plaintiff raises no challenged to the ALJ's decision based on the VE's findings, opinions and testimony, that evidence will not be summarized.

- Plaintiff was unable to attend her therapy sessions for two weeks due to severe pain caused by tumors on her nerve endings (neurofibromatosis). During that time period, her psychological symptoms worsened. (Tr. 61)

- Plaintiff also explained that she had been diagnosed with PTSD. While in law school plaintiff had been pulled into an alley and attacked at gun point. Years later, she was carjacked in Cincinnati by three men with "machine weapons." Plaintiff testified that, as a result of these attacks, she had fear, anxiety, and nightmares. (Tr. 63)

- Plaintiff was also diagnosed with ADHD. However, she had stopped taking medication for it because it was causing her to be manic. (Tr. 64)

- When asked how she was able to make it through law school without medication for ADHD, plaintiff testified, "I just dealt with it. I had trouble keeping my life together. Like, I'd lose everything and forget bill payments and stuff like that, but I was able to handle the class-work side of things." (Tr. 64)

- Plaintiff had some special accommodations when she was at Cleveland State working on her master's degree. She was unable to show up for her exams due to illness and needed longer to complete things like her thesis. (Tr. 65)

- Plaintiff had suffered pain for a long time but it got much worse in 2006. In 2007, she had surgery to remove tumors from the upper part of her leg. (Tr. 65) Before the surgery, plaintiff testified that she could barely sit because of the pain. However, after the surgery, she had nerve damage in her leg which caused shooting pains and spasms. (Tr. 66)

- Plaintiff received various treatments for the pain from the Cleveland Clinic. She tried nerve blocks, pain medication and ketamine infusions. Plaintiff testified that her pain did not fully resolve with any of those treatments. (Tr. 66)

- Plaintiff had another surgery to remove more tumors on her sciatic nerve in 2013. She experienced relief from pain after the surgery and was able to move her toes again. However, the surgeon took out some of her muscle which caused a limp and balance problems. Plaintiff testified that she was required to put more weight on her right leg and had fallen frequently as a result. (Tr. 67)

- Plaintiff had good days and bad days. On good days, plaintiff was able to be on her feet for about an hour at a time and for four hours total. She was able to sit for about an hour and 15 minutes before she needed to take a break to stand and walk around for at least 15 minutes. (Tr. 68)

- Plaintiff's bad days were triggered by weather, her monthly cycle, not sleeping, etc. On bad days, plaintiff stayed home and sat in her recliner. She tried to stay off her feet with breaks. (Tr. 69)

- Plaintiff testified that her anxiety and depression were connected to the pain she felt. Her pain intensified when she was experiencing symptoms from her mental impairments. (Tr. 69-70)

- In addition to the pain she had in her leg, plaintiff also had constant pain in her neck and shoulder, but it was not as painful as her leg. The pain in her neck and shoulder prevented her from lifting heavy things. (Tr. 70)

- The ALJ asked plaintiff to explain why her psychologist, Dr. Nathan, repeatedly stated in her notes that plaintiff was normal, had normal speech patterns etc. The ALJ noted that plaintiff was not acting normal during the hearing and she wanted to try to reconcile this discrepancy. Plaintiff seemed to be unable to respond to the ALJ's question. She complained that her heart was beating faster, she was nervous, and she was unable to express herself. (Tr. 72-73)

- The ALJ also asked plaintiff about medical records documenting marijuana use. Plaintiff testified that she had tried to use it for pain relief and to help with anxiety attacks. The ALJ asked plaintiff how she purchased marijuana if she was not socializing with people. Plaintiff testified that she had gotten it from her boyfriend. (Tr. 74)

- Plaintiff met her boyfriend in self-defense class and was seeing him once or twice a week. They watched TV, took short walks, went to movies and sometimes made dinner together. (Tr. 75)

- Plaintiff was living in Chardon with her parents. Her mother drove her to about half of her medical appointments because sometimes plaintiff didn't feel like she could drive. However, plaintiff did own her own car and was able to drive. (Tr. 77)

- Dr. Bertsch's notes contained a statement that plaintiff had hurt herself while dancing. Plaintiff explained that she had been at a wedding where she tried to dance and inured her foot. She did not normally go dancing. (Tr. 78)

## IV.     Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

[A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[3]….

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner

---

[3] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## V. The ALJ's Decision

The ALJ issued a decision on July 17, 2015. A summary of her findings is as follows:

1. Blaha met the insured status requirements of the Social Security Act through June 30, 2010. (Tr. 17)

2. Blaha had not engaged in substantial gainful activity since January 23, 2013, the alleged onset date. (Tr. 17)

3. Blaha had the following severe impairments: neurofibromatosis, bipolar, attention deficit hyperactivity disorder (ADHD), and posttraumatic stress disorder. (Tr. 17)

4. Blaha did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 18)

5. Blaha had the residual functional capacity to perform light work, except she could only occasionally use foot controls with the left lower extremity; she could never climb any ladders, ropes, or scaffolds; could only occasionally climb ramps and stairs; could frequently balance, kneel and crouch; but could only occasionally stoop and crawl. She was required to avoid jobs that required working at unprotected heights. She had no memory limits and could understand/remember simple and detailed instructions. She could perform work that was goal oriented in nature but no work in a factory setting with machine pace or piece rate type work. She could interact with the general public, co-workers, and supervisors up to occasionally. (Tr. 20)

6. Blaha was unable to perform past relevant work. (Tr. 28)

7. She was born on August 4, 1982 and was 30 years old on the alleged disability date. Thus she was considered a younger individual age 18-49. (Tr. 28)

8. Blaha had at least a high school education and was able to communicate in English. (Tr. 28)

9. Transferability of job skills was not an issue because Blaha was not disabled whether or not she had transferable job skills. (Tr. 28)

10. Considering Blaha's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that she could perform. (Tr. 28)

Based on the foregoing, the ALJ determined that Blaha had not been under a disability from January 23, 2013, the alleged onset date, through the date of the ALJ's decision. (Tr. 29)

## VI.     Law & Analysis

### A.     Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner may not be reversed just because the record contains substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because the Commissioner enjoys a "zone of choice" within to decide cases

without risking being second-guessed by a court. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

The court also must determine whether the ALJ decided the case using the correct legal standards. If not, reversal is required unless the legal error was harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant whose application has been denied understands why.

**B.     Plaintiff's Complaints of Pain, Fatigue and Functional Limitations**

Plaintiff argues that the ALJ did not properly assess plaintiff's pain syndromes, her complaints of pain, and her credibility regarding her limitations. Plaintiff was diagnosed with various pain syndromes related to her condition of neurofibromatosis. (See, e.g., Tr. 678) She

was also diagnosed with generalized pain syndromes, which seemed to be compounded by her dysmenorrhea and ovarian cyst complex. (Tr. 708) Over the years, plaintiff has tried numerous methods to decrease her pain including heavy pain medication, surgeries, TENS unit, cervical epidural and steroid injections and ketamine infusions. (Tr. 678, 706, 543-554, 623, 1230, 871-872, 408, 413, 417-418, 426)

The ALJ did not find plaintiff's pain syndromes to be severe impairments. (Tr. 17) In some instances an ALJ's failure to list a diagnosed pain syndrome has been determined to be harmless error. *See Maziarz v. Secretary, HHS,* 837 F.2d 240, 244 (6th Cir. 1997). However, when it is not clear whether the ALJ considered the particular impairment at the other steps of the sequential process, courts have remanded the matter for consideration of the impairment in rendering the RFC. *See Meadows v. Comm'r,* 2008 U.S. Dist. LEXIS 110586 (S.D. Ohio, Nov. 13, 2008). Here, the ALJ mentioned plaintiff's complaints of pain, calling them "symptoms," but she determined that plaintiff's statements regarding the intensity, persistence and limiting effects of her symptoms were not entirely credible. (Tr. 20, 23) Plaintiff argues that, in arriving at that decision, the ALJ failed to take plaintiff's pain disorders into consideration.

By regulation, the ALJ must consider all objective medical evidence in the record, including medical signs and laboratory findings, where such evidence is produced by acceptable medical sources. See 20 C.F.R. § 404.1513. The agency states it will "consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a). Further, the agency states that it "will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate

your statements." 20 C.F.R. §404.1529(c)(2). The agency must follow and apply its own procedural regulations, and failure to do so warrants remand. *Minor v. Comm'r of Soc. Sec.* 513 Fed. Appx. 417, 434 (6th Cir. 2013).

It is not readily apparent that the ALJ considered plaintiff's diagnosed pain syndromes when she determined Blaha's residual functional capacity. However, on balance, it seems as though she did not. The ALJ's decision listed many of plaintiff's complaints including her pain and the limitations plaintiff reported as a result. (Tr. 20-21) After listing these complaints, the ALJ stated, "I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (Tr. 21) Unfortunately, the ALJ never adequately explained that conclusion.

In *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 244 (6th Cir. 2007), the Sixth Circuit reversed a no-disability finding because the ALJ focused on objective medical evidence demonstrating normal clinical and testing results and dismissed subjective complaints of pain in favor of opinions given by non-treating sources. That is exactly what the ALJ did in this case. After including the boilerplate statement that she had "considered the objective findings and symptoms to determine any added or accumulative effects the claimant's physical impairments placed on her ability to function," the ALJ stated:

> However, the above limitations fully encompass the claimant's physical
> restrictions as the medical evidence does not establish more severe restriction or
> work preclusive limitations. During her medical examinations, her lungs were
> clear to auscultation bilaterally, and she had easy respiratory effort with no use of
> accessory muscles. Except for her left lower extremity, her extremities revealed
> no cyanosis or edema, and she generally exhibited normal sensation, reflexes,
> posture, coordination, and gait. She generally had full range of motion and
> normal muscle strength, tone and bulk. Her bilateral upper and lower extremity

coordination and muscle stretch reflexes are physiologic and symmetric. Her back showed no pain to palpation over the lumbar spine and paraspinous muscles and normal range of motion without pain reproduction. Toe walking, heel walking, and tandem gait were normal, and she was able to rise from a chair without using her arms. The clamant was communicative, and there is no indication of auditory or visual deficits. Her clinicians noted that she had no difficulty performing or completing routine activities of daily living. She appeared well-nourished, well appearing and hydrated. She described improvement with treatment and continued to exercise at the YMCA, do yoga, and swim. Accordingly, no additional exertional, postural, manipulative, environmental, visual or communicative limitations are warranted.

(TR. 22)

Notably, the ALJ did not discuss the plaintiff's constant complaints of pain that permeated her medical records or the effects that the pain medications had on her functional abilities. Elsewhere, in her discussion of plaintiff's mental limitations, the ALJ stated, "[i]t is clear that her neurofibromatosis is a serious condition that impacts her physical functioning and causes pain. This condition is permanent and chronic." (Tr. 23) However, the ALJ did not discuss any limitations that may have been caused by plaintiff's pain. Rather, in a rather superficial analysis, the ALJ listed the objective medical findings and concluded that plaintiff was physically capable of doing more than opined by plaintiff or her treating physicians. Moreover, as argued by plaintiff, the ALJ conflated symptoms and activities from different periods. Some of the activities and findings the ALJ used to undermine the credibility of plaintiff's pain complaints during the post-onset period actually occurred earlier.

When a claimant presents pain as the cause of disability, the decision of the Sixth Circuit in *Duncan v. Secretary of Health and Human Services,* 801 F.2d 847 (6th Cir. 1986) provides the proper analytical framework:

There must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from that condition or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

32

Objective medical evidence of pain includes evidence of reduced joint motion, muscle spasm, sensory deficit, or motor disruption. The determination of whether the condition is so severe that the alleged pain is reasonably expected to occur hinges on the assessment of the condition by medical professionals. Both alternative tests focus on the claimant's "alleged pain." Although the cases are not always clear on this point, the standard requires the ALJ to assume arguendo pain of the severity alleged by the claimant and then determine whether objective medical evidence confirms that severity or if the medical condition is so bad that such severity can reasonably be expected.

Here, plaintiff had an underlying medical condition that could reasonably be expected to cause pain. Indeed, as noted above, the ALJ recognized this fact. (Tr. 23) And the records contain instances when plaintiff was experiencing spasm, decreased range of motion, decreased strength, etc. (e.g. 996, 1002) However, even excluding such evidence, a claimant's failure to meet the *Duncan* standard does not necessarily end the inquiry. As the Social Security Administration has recognized in a policy interpretation ruling on assessing claimant credibility, in the absence of objective medical evidence sufficient to support a finding of disability, the claimant's statements about the severity of his or her symptoms will be considered with other relevant evidence in deciding disability:

> Because symptoms, such as pain, sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, the adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements if a disability determination or decision that is fully favorable to the individual cannot be made solely on the basis of objective medical evidence.

Social Security Ruling (SSR) 96-7p, Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 61 Fed. Reg. 34483 (July 2, 1996); *See also, Wines v. Comm'r Soc. Sec.,* 268 F. Supp.2d 954, 957 (N.D. Ohio 2003).

Similarly, 20 C.F.R. 416.929(c)(3)(i)-(vi) provides:

We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work … solely because the available objective medical evidence does not substantiate your statements.

When the objective medical evidence does not substantiate the claimant's subjective complaints, the ALJ must assess the credibility of the claimant. The ALJ's findings as to credibility are entitled to deference because she has the opportunity to observe the claimant and assess her subjective complaints. *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001). However, the ALJ cannot decide credibility based solely upon an "intangible or intuitive notion about an individual's credibility."" Soc. Sec. Rul. 96-7p, 1996 WL 374186, at * 4. Rather, such determinations must find support in the record. When a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record."

The regulations set forth factors that the ALJ should consider in assessing credibility. These include the claimant's daily activities; the location, duration, frequency, and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication; and treatment or measures, other than medication, taken to relieve pain. 20 C.F.R. § 416.929(c)(3)(i)-(vi). If the ALJ rejects the claimant's complaints as incredible, she must clearly state her reasons for doing so.

Here, plaintiff alleges that she was unable to sustain employment because of constant pain, fatigue, and the effects of her impairments. Plaintiff contends it was improper for the ALJ to determine that plaintiff's testimony regarding her pain was not fully credible, yet not explain in what specific ways her complaints were inconsistent with the diagnosed pain disorders. Notably, plaintiff's medical records reflect that she carried a diagnosis for Chronic Regional Pain Syndrome, Type II, since at least 2009.

The ALJ also did not discuss plaintiff's statements regarding the impact of her pain medications on her ability to function. Plaintiff argues that it was improper for the ALJ to determine that plaintiff's complaints were not fully credible when she never even mentioned the pain disorders that gave rise to her pain. Plaintiff contends that the ALJ's decision regarding plaintiff's credibility and the statements of her pain were not supported by substantial evidence. (ECF Doc. No. 12, pp. 14-18)

Regarding plaintiff's credibility, the ALJ stated,

Based on a consideration of all the evidence in the record, I find that the claimant's statements are not fully consistent with the medical signs and laboratory findings and other information provided by medical sources, including the longitudinal medical record, to a degree that supports a finding of disability. While I find the claimant's statements credible that her abilities are affected by reported symptoms, they are found only partially credible as to the extent of the functional limitations due to the symptoms. In determining the credibility of the claimant's statements in this case, I considered the entire case record as required under 20 CFR 416.929(c)(2)-(3) and SSR 96-7p.

I note the claimant has described daily activities, which are not limited to the extent one would expect, given her complaints of disabling symptoms and limitations. Despite alleging a total inability to work and indicating that she was very limited in what she could do, the claimant reported that she was able to care for her personal needs on a daily basis. She also reported that she was able to prepare meals, do housekeeping chores (laundry, dishes), drive, shop in stores, read, care for her pets, occasionally pet sit for others, count change, gardening, and visits with her boyfriend. The claimant reported that she enjoyed cooking, reading, gardening and taking online classes. During a face-to-face interview with Social Security Staff, the interviewer observed no difficulty in the claimant's ability to hear, read, breathe, understand, concentrate, talk, sit, stand, walk, see, use her hands, or write. Certainly, these are not the activities and abilities of an

individual who is completely unable to engage in any substantial gainful activity and clearly reflect the ability to perform the jobs cited by the impartial vocational expert under the residual functional capacity adopted in this decision, which includes the most serious restricts established by the medical evidence.

Moreover, the claimant has not generally received the type of medical treatment one would expect for a totally disabled individual. Medical records showed that she frequently missed appointments. This may be an indication that her symptoms are not as severe as she purports. This may also demonstrate a possible unwillingness to do that which is necessary to improve her condition.

(Tr. 24)

As plaintiff points out in her reply brief, many of the daily activities referenced by the ALJ were things that plaintiff had been able to do prior to the alleged onset date, but that she was no longer doing on a regular basis. The functional reports which plaintiff completed were completed in 2013. These reports indicated that plaintiff had good and bad days and that she was unable to do any of these activities on bad days. Plaintiff reported that on bad days, she could not get dressed and did not bathe as often. (Tr. 293) Sometimes she would not be able to sleep for three days due to pain. (Tr. 293)

The ALJ also questioned plaintiff's credibility stating that plaintiff had not generally received the type of medical treatment one would expect for a totally disabled person. However, the ALJ did not explain what treatment one would expect. In fact, plaintiff sought ongoing treatment for her pain syndromes for many years. Medical records show that she regularly sought treatment before and after the amended onset date and also after the administrative hearing.

The ALJ observed that plaintiff frequently missed appointments. But the record she referred to support this statement actually supports a finding that plaintiff continued to suffer from medical problems associated with her pain syndromes. The medical record cited by the ALJ was from an adult partial hospitalization program from Ravenwood Mental Health Center.

This record showed numerous cancellation dates by plaintiff. However, the narrative section in the notes explained that plaintiff was initially scheduled to attend the partial hospitalization sessions three times per week, but was unable to do so because of her "medical problems and appointments." The record stated that when plaintiff's weekly sessions were reduced to two times per week, it resulted in fewer cancellations. (Tr. 1229) The fact that plaintiff missed these appointments does not support the ALJ's theory that plaintiff did not need treatment or was unwilling to improve her condition. If anything, this medical record is evidence of plaintiff's continued physical suffering while she also sought treatment for her mental impairments.

Plaintiff also argues that the ALJ improperly assessed her mental impairments. Plaintiff has been diagnosed with bipolar disorder. Plaintiff contends that a person suffering from mental health conditions will have better days and worse days – as indicated in plaintiff's functional reports. (Tr. 268-276, 292-299) Plaintiff argues that the ALJ pointed to intermittent symptoms of improvement, rather than considering a longitudinal perspective of plaintiff's impairment. It appears that someone who has good and bad days can never be found disabled under the ALJ's approach, because the things a claimant is able to do on good days will always offset the pain and things she cannot do on bad days.

In her responsive brief, defendant argues that the ALJ properly considered plaintiff's pain allegations and discounted them due to numerous facts in the record suggesting that plaintiff was capable of functioning at a normal physical level. However, in making this argument, defendant – like the ALJ – cites many facts gleaned from medical records pre-dating plaintiff's amended onset date.

Plaintiff argues in her reply brief that, by the time of the administrative hearing, she was no longer able to do many of the activities the ALJ referred to in her decision and the defendant in her brief. Plaintiff points out the following:

- Plaintiff obtained her law degree in 2008 and her master's degree in 2012, before her January 23, 2013 onset date. (Tr. 41)

- There was no evidence that she continued to do martial arts after October 12, 2012. (Tr. 388)

- Plaintiff stopped doing yoga in January or February of 2013 after experiencing intense leg pain. (Tr. 953)

- There was no evidence that she played tennis after November 2012. (Tr. 443)

- Plaintiff was using the pool at the YMCA as a part of her physical therapy. However, by January 15, 2014, she was having increased pain from swimming and her physical therapist told her she needed doctor's approval to swim or do other physical activity. (Tr. 976)

- Plaintiff last went to Costa Rica in early 2011. (Tr. 515)

Plaintiff contends that the ALJ and the defendant engaged in faulty analysis by using these former activities to support their position that plaintiff's complaints of pain were not as severe as she suggested.

The undersigned agrees with plaintiff that the ALJ failed to properly analyze plaintiff's pain syndromes and her credibility related to her complaints of pain. The ALJ did not find plaintiff's pain syndromes to be severe impairments; nor does it appear that the ALJ considered these syndromes or the pain they caused when she assessed plaintiff's credibility or her residual functional capacity. The ALJ's failure to properly analyze the record evidence in accordance with agency regulations requires the conclusion that her decision is not supported by substantial evidence. Remand is recommended so that the ALJ may properly consider plaintiff's pain syndromes and complaints of pain.

## C.    Residual Functional Capacity

Plaintiff also argues that, in forming plaintiff's residual functional capacity, the ALJ failed to address whether plaintiff was able to sustain work-like activity in light of her chronic pain disorders and the fluctuating nature of her mental health conditions.

An ALJ's residual functioning capacity determination is proper when it is based upon "all of the relevant medical and other evidence." 20 C.F.R. § 416.945 (a)(3).  At its most basic level, a claimant's residual functional capacity is simply an indication of [her] work-related abilities despite her limitations. See 20 C.F.R. § 404.1545(a)(1).  The residual functional capacity is not a medical opinion, but an administrative determination reserved to the Commissioner. See 20 C.F.R.§ 404.1527(e)(2).  Accordingly, the ALJ bears the responsibility for determining a claimant's residual functional capacity based on all of the relevant evidence. See 20 C.F.R. § 404.1545(a)(3).

Under 42 U.S.C. § 405(g), the findings of the ALJ are conclusive if they are supported by substantial evidence.  However, as noted above, the ALJ failed to properly analyze plaintiff's pain syndromes and her complaints of pain when forming plaintiff's residual functional capacity.  This is significant since plaintiff's treating physician, Dr. Bertsch, opined that plaintiff was limited because of her chronic pain and would likely be absent from work more than four times per month. (Tr. 756, 760)  Dr. Nathan, plaintiff's treating psychologist, similarly opined that plaintiff's ability to maintain attention, sustain concentration, persist in a task, complete them in a timely fashion, etc. were all poor.  (Tr. 638)  The VE testified that an individual who missed work four or more times per month would not be able to sustain employment. (Tr. 84)

Plaintiff argues that, in addition to ignoring the evidence regarding plaintiff's inability to sustain employment, the ALJ admitted that the evidence in the record showed that the claimant

had some "difficulty in interacting independently, appropriately, effectively, and on a substantial basis with other individuals." Plaintiff contends that the ALJ should have accounted for this evidence in her RFC.[4]

The ALJ failed to properly analyze plaintiff's pain syndromes, her complaints of pain and her credibility related to such. A proper analysis of plaintiff's pain syndromes and complaints of pain is likely to impact the ALJ's finding of residual functional capacity. Accordingly, the undersigned recommends remand on this basis as well.

### D. Treating Physician Rule

Finally, plaintiff argues that the ALJ failed to properly apply the treating physician rule. Specifically, plaintiff contends that the ALJ erred in failing to specify the weight she assigned to the treating physicians, Dr. John Bertsch and Dr. Erika Nathan.[5]

Evidence from treating doctors who treat Social Security applicants must be weighed using specific requirements created by the federal government. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). The ALJ must examine what work the treating source performed. *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013). The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

---

[4] ECF Doc. 12, Page ID# 1385-1387.

[5] ECF Doc. 12, Page ID#1387-1389.

If the ALJ does not give the opinion controlling weight, then the opinion is still entitled to significant deference or weight that takes into account how long and how frequently the doctor treated the patient, how well supported the opinion is, and whether the opinions of the source are consistent with the totality of the medical evidence in the record. The ALJ must also pay attention to whether the doctor is a specialist in the field of medicine in which she/he is expressing an opinion. 20 C.F.R. § 416.927(c)(2)-(6). The ALJ is not required to explain how she considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); see also *Cole*, 661 F.3d at 938 ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned."). "These reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (July 2, 1996)) (internal quotation marks omitted).

A failure to follow these procedural requirements "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based on the record." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir. 2007). The Sixth Circuit Court of Appeals "do[es] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJs that do not comprehensively set forth reasons for the weight assigned." *Cole*, 661 F.3d at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)) (alteration in original) (internal quotation marks omitted).

The ALJ's "good reasons" must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). As the Sixth Circuit has noted,

> The conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors. Otherwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion. Such a rule would turn on its head the regulation's presumption of giving greater weight to treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.

*Id*. at 377. On the other hand, the ALJ is not obligated to provide an "exhaustive factor-by-factor analysis." See *Francis v. Comm'r of Soc. Sec.* 414 Fed. Appx. 802, 804 (6th Cir. 2011).

### 1. Dr. John Bertsch

Regarding Dr. Bertsch's opinion, the ALJ stated:

> On October 17, 2013, John Bertsch, M.D., completed a physical residual functional capacity assessment. I decline to grant controlling weight to this opinion because it is not consistent with his own treating records nor other records. He indicated that the claimant's experience of pain would *constantly* interfere with attention and concentration, nevertheless, the claimant was capable of low stress jobs. The claimant could only walk a half block, sit for 30 minutes, and stand for 15 minutes. The claimant would require two or three unscheduled breaks weekly, and the claimant could only lift ten pounds occasionally. The claimant would miss work more than four times a month due to her impairments/treatment. However, his assessment is inconsistent with his own records as the records he attached to his assessment showed a primarily normal examination. The opinion expressed is also quite conclusory, providing very little explanation of the evidence relied on in forming that opinion. Dr. Bertsch did not document positive objective clinical or diagnostic findings to support the functional assessment. The course of treatment pursued by the doctor has not been consistent with what one would expect if the claimant were truly as limited as the doctor reported.

(Tr. 26)

The ALJ's explanation regarding Dr. Bertsch is inadequate. She did not indicate the weight, if any, she was assigning to his opinion. She did not take into account how long and how frequently Dr. Bertsch had been treating plaintiff. She stated that his opinion was not consistent with his own records, but she did not explain any perceived inconsistencies. She stated that the records attached to Dr. Bertsch's opinion show normal findings. However, an excerpt from one of the attached records shows the inaccuracy of the ALJ's assessment. On August 12, 2013, Dr. Bertsch's note stated:

> Pt with hx of neurofibromatosis, with recent surgery with neuropathic pain, lots of steroid related diff tolerating, leg pain and weakness, walking issues, on steroids to help with edema and now having [] steroid emotional lability, crying, muscle weakness and tremor, oral candida issues, some opening of incision in focal area of popliteal knee region, cont. anxiety, lots of diff with pain, sees pain management, losing insurance with disability claim incomplete and denied, emotionally doing poorly with stress and current health issues, losing insurance in 2 weeks due to issues, needs scripts, cont need for valium for ability to control spasms and tx of other associated illnesses.

(Tr. 770) This medical record also noted several objective findings supporting plaintiff's complaints from Dr. Bertsch's review of plaintiff's systems. (Tr. 771-772) This is one of the records that the ALJ described as showing "normal" findings and which she felt was inconsistent with Dr. Bertsch's opinions. While there may have been some inconsistencies between Dr. Bertsch's office notes and his opinions, the ALJ did not explain what they were. And, ironically, the ALJ stated that *Dr. Bertsch's* opinion was conclusory.

The regulations require "good reasons" to be supplied when a treating doctor's opinions are not given controlling weight for two reasons: first, a clear explanation, "lets the claimants understand the disposition of their cases," particularly where a claimant knows that her physician has deemed her disabled and therefore "might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Rogers,*

486 F.3d at 242 (quoting *Wilson* 378 F.3d at 544). Second, giving an explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544.

Because the ALJ did not properly consider the evidence from plaintiff's treating physician, Dr. John Bertsch, the undersigned recommends reversal and that this matter be remanded for further proceedings consistent with this report and recommendation.

## 2. Dr. Erika Nathan

The ALJ provided a more thorough explanation of her decision to reject the opinion of plaintiff's treating psychologist, Dr. Erika Nathan. Regarding Dr. Nathan's opinion, the ALJ stated:

> Although Dr. Nathan is a treating source, I do not give her opinions controlling weight for several reasons. First, her opinions are not consistent with her own treatment notes. For example, recently in December 2014 and January 2015, she documented many normal findings in the claimant's mental status examination, including normal memory. Another example of an inconsistency is her opinion the claimant was markedly limited in understanding and carrying out simple instructions and extremely limited in carrying out complex instructions and making work related decisions. However, this does not comport with the normal findings noted in December 2014 and January 2015, as noted below.

> [The ALJ then cites notes from Dr. Nathan's records where plaintiff is repeatedly described as "normal."]

> Subsequent to the hearing, the claimant provided a statement from Dr. Nathan in which she attempted to explain the inconsistencies between her office notes and the opinion she offered in Exhibit 2F. Dr. Nathan stated the medical record form did not give her the opportunity to address the claimant's true mental status. This statement is not persuasive since Dr. Nathan had control of the information she could provide in the office notes. She entered the information in the office visits in a free flowing narrative nature, and she could have inserted whatever information she chose. Hence, her statements in Exhibit 27F, appear to be offered in an attempt to obtain disability for her patient rather than provide objective information. * * *

(Tr. 26)

In considering whether the ALJ provided good reasons for rejecting the opinion of Dr. Nathan, the undersigned notes that this explanation was considerably better than the opinion stated for rejecting the opinion of Dr. Bertsch. Having said that, the ALJ again failed to state the weight she was giving to Dr. Nathan's opinion or to address the other factors required by the regulations. She did not consider how long or how often Dr. Nathan had been treating plaintiff, whether Dr. Nathan was a specialist, etc. However, the ALJ did explain an inconsistency between Dr. Nathan's opinion and her records and she correctly pointed out that Dr. Nathan's explanation of this inconsistency was lacking. Because there are several different grounds for remand in this matter, it is unnecessary for the court to decide whether the ALJ adequately rejected the opinion of plaintiff's treating psychologist, Dr. Nathan. Nonetheless, the undersigned believes that the ALJ provided good reasons for her rejection of Dr. Nathan's opinion and would not recommend remand on that basis.

## IV.    Recommendations

The ALJ failed to properly assess plaintiff's pain syndromes, her complaints of pain, and her credibility related to these complaints. The ALJ also failed to provide good reasons for rejecting the opinion of plaintiff's treating physician, Dr. John Bertsch. Proper analysis of these issues in accordance with the agency's regulations is likely to impact the ALJ's finding regarding plaintiff's residual functional capacity. I recommend that the final decision of the Commissioner be VACATED and that the case be REMANDED, pursuant to 42 U.S.C. § 405(g), for further proceedings.

Dated: June 12, 2017

Thomas M. Parker
United States Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).